# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TL OF FLORIDA, INC., | : | |
| Plaintiff, | : | |
| v. | : | C.A. No. 13-2009-LPS |
| TEREX CORPORATION, d/b/a TEREX CONSTRUCTION AMERICAS, | : | |
| Defendant. | : | |

---

Frank E. Noyes, II, Esquire, OFFIT KURMAN, Wilmington, DE

W. Michael Garner, Esquire, GARNER & GINSBURG, P.A., Minneapolis, MN

     Attorneys for Plaintiff TL of Florida, Inc.

John C. Phillips, Jr., Esquire, Lisa C. McLaughlin, Esquire, PHILLIPS GOLDMAN McLAUGHLIN & HALL, P.A., Wilmington, DE

     Attorneys for Defendant Terex Corporation

---

## MEMORANDUM OPINION

UNSEALED ON
OCTOBER 28, 2016

October 25, 2016
Wilmington, Delaware

**STARK, U.S. District Judge:**

Pending before the Court are Defendant Terex Corporation's (hereinafter "Terex" or "Defendant") Second Motion for Both Summary Judgment and Judgment on the Pleadings (D.I. 109) and *Daubert* Motion to Exclude the Expert Testimony of Plaintiff TL of Florida's ("TL" or "Plaintiff") damages expert, Donald Erickson ("Erickson") (D.I. 111).

## I.   BACKGROUND[1]

In or about 2008, Terex, a Delaware corporation, approached TL, a Florida corporation, about becoming a Terex distributor. (*See* D.I. 20 ¶ 9) "In presenting the opportunity . . . , Terex represented that there was a market for Terex heavy equipment in Southern Florida" and provided TL a Distributorship Agreement. (*Id.*) During the discussions preceding the signing of the Distributorship Agreement, Terex allegedly misrepresented or failed to disclose four sets of facts that TL alleges would have been material to TL's decision to enter into the Distributorship Agreement. (*See id.* ¶ 11)

First is the "Equipment Market Representation," whereby Terex misrepresented that there was a market for Terex heavy equipment in Southern Florida. (*See id.* ¶¶ 1, 11) Second is the "Parts Market Representation," whereby Terex misrepresented that there was a market for Terex parts in Southern Florida. (*See id.*) Third are the "Dealership Selection Representations," whereby Terex failed to disclose that it "did not select distributors on the basis of demand in the marketplace or quality of the distributor[,] [but] [i]nstead, it would give a distributorship

---

[1]This background is based on the facts alleged by Plaintiff in the Amended Complaint. For purposes of evaluating Defendant's motion for judgment on the pleadings, these facts are taken as true. Where, in evaluating Defendant's motion for summary judgment, different factual contentions are pertinent, the Court will note these differences.

agreement to any person who asked for it and had the financial ability to purchase whole goods,"

and further failed to disclose that "Terex was in financial distress and had embarked upon a

practice of signing up distributors and obligating them to purchase whole goods without regard to

the demand in [the] marketplace or the ability of the distributor to market the products." (*Id.*

¶ 11) Fourth are the "Dealer Representations and Omissions," whereby Terex failed to disclose

that TL "was surrounded by dealers in authorized Terex parts who could sell those parts to

customers without having to maintain the inventory of whole goods or infrastructure that Plaintiff

was required to maintain.  As a result of not having to maintain an inventory of whole goods,

these dealers could undersell TL in the substantial and lucrative parts market." (*Id.*)  TL alleges

that if it had known all of these facts, "it would not have entered into the Distributorship

Agreement." (*Id.* ¶ 12)

      In 2008, TL discovered that Terex's website and other websites listed authorized Terex

dealers near TL's facility. (*See id.* ¶ 13)  When TL confronted Terex about this, Terex

represented that these were not current dealers and that the website listings were inaccurate. (*See

id.*)  In 2010, TL discovered shipments of Terex parts on a Federal Express truck bound for

another dealer in the area. (*See id.* ¶ 14)  TL alleges that Terex "continued to represent . . . that

there were no authorized dealers within close proximity to TL." (*Id.* ¶ 15)  TL further alleges

that it did not discover that any of Terex's representations were false until May 2012, based on an

interaction with the President of third-party Minequip Corporation. (*See id.* ¶¶ 17-18)

      TL filed the instant suit on December 9, 2013, alleging fraudulent non-disclosure,

negligent misrepresentation, violation of the Florida Deceptive and Unfair Trade Practice Act

("FDUTPA"), and breach of the implied covenant of good faith and fair dealing. (*See* D.I. 1)  On

July 3, 2014, the Court granted in part Terex's motion to dismiss for failure to state in claim, dismissing TL's claim for violation of the implied covenant of good faith and fair dealing; the Court also granted TL's motion for leave to amend the complaint. (*See* D.I. 18; D.I. 19)  TL filed its amended complaint on July 11, 2014. (*See* D.I. 20)[2]  On September 24, 2015, the Court granted in part Terex's motion for summary judgment, finding that Delaware's three-year statute of limitations barred TL's claims with respect to the Equipment Market Representation. (*See* D.I. 62; D.I. 63)

Terex now moves for summary judgment and judgment on the pleadings with respect to its claims regarding the Parts Market representation, the Dealership Selection Representation, and the Dealer Representations and Omissions. (*See* D.I. 110)  Terex filed the pending motion on August 31, 2016 and briefing was completed on October 4. (*See* D.I. 109; 110; 117; 120)  The Court heard oral argument on the motions on October 6, 2016. (*See* D.I. 125 ("Tr."))

## II.     LEGAL STANDARDS

### A.     Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically

---

[2]The amended complaint included identical allegations related to the breach of the implied covenant of good faith and fair dealing (*compare* D.I. 1 ¶¶ 28-31 *with* D.I. 20 ¶¶ 35-38), although Plaintiff recognizes that this claim is no longer in the case (*see* D.I. 42 at 7).

stored information, affidavits or declarations, stipulations (including those made for the purposes

of the motion only), admissions, interrogatory answers, or other materials," or by "showing that

the materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1)(A) & (B).  If the moving party has carried its burden, the nonmovant must then "come

forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (internal quotation marks and

emphasis omitted).  The Court will "draw all reasonable inferences in favor of the nonmoving

party, and it may not make credibility determinations or weigh the evidence." *Reeves v.*

*Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

      To defeat a motion for summary judgment, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586; *see also Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2005) (stating

party opposing summary judgment "must present more than just bare assertions, conclusory

allegations or suspicions to show the existence of a genuine issue") (internal quotation marks

omitted). However, the "mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment;" and a factual dispute

is genuine only where "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in

original).  "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a

4

party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere

existence of a scintilla of evidence" in support of the non-moving party's position is insufficient

to defeat a motion for summary judgment; there must be "evidence on which the jury could

reasonably find" for the non-moving party. *Anderson,* 477 U.S. at 252.

### B.      Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the

pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P.

12(c). When evaluating a motion for judgment on the pleadings, the Court must accept all

factual allegations in a complaint as true and view them in the light most favorable to the non-

moving party. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008). A Rule 12(c)

motion will not be granted "unless the movant clearly establishes that no material issue of fact

remains to be resolved and that he is entitled to judgment as a matter of law." *Id.* (internal

quotation marks omitted); *see also Maio v. Aetna, Inc.,* 221 F.3d 472, 482 (3d Cir. 2000). This is

the same standard as a Rule 12(b)(6) motion to dismiss. *See Turbe v. Gov't of Virgin Islands*,

938 F.2d 427, 428 (3d Cir. 1991). "The purpose of judgment on the pleadings is to dispose of

claims where the material facts are undisputed and judgment can be entered on the competing

pleadings and exhibits thereto, and documents incorporated by reference." *Venetec Int'l, Inc. v.

Nexus Med., LLC,* 541 F. Supp. 2d 612, 617 (D. Del. 2008); *see also In re Burlington Coat

Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (explaining that any documents that are

integral to pleadings may be considered in connection with Rule 12(c) motion).

5

## III.    DISCUSSION

TL argues that it lost profits on sales Terex made to CPEX accounts and on sales that CPEX accounts made to end users. "CPEX" refers to parts-only accounts "that were [allegedly] selling to [TL's] potential customers." (D.I. 117 at 6)  Whereas TL was required to carry an inventory of Terex heavy equipment in order to also be an authorized dealer of Terex parts, the CPEX accounts were permitted to sell Terex parts (in competition with TL) without having to carry any amount of Terex heavy equipment

As discussed in greater detail in Section III.A below, there is not sufficient evidence in the record from which a reasonable jury could find for TL on either of its theories of lost profits. Accordingly, the Court will grant summary judgment in favor of Terex of no lost profits.  The Court will deny Terex's *Daubert* motion, which seeks to exclude the testimony of TL's damages expert, as moot.

The Court further finds that, for independent reasons, Terex would also be entitled to summary judgment or judgment on the pleadings as to claims based on the Dealer Representations and Omissions and the Dealership Selection Representations.  The Court addresses these issues, as well as Terex's other arguments that it is entitled to summary judgment and judgment on the pleadings, in sections III.B and III.C.

### A.    Motion for Summary Judgment – Damages Theories

#### 1.    Lost Profits Based on CPEX Account Sales

Terex argues that it is entitled to summary judgment that TL is not entitled to lost profits based on sales CPEX accounts made to users located outside of TL's territory.  Terex asserts that TL may not recover lost profits based on such sales because the Distributorship Agreement

barred them. In particular, Terex points to Section 3.1(b) and Schedule B of the Distributorship

Agreement, which state that TL is allowed to sell Terex parts to customers in a specific territory.

(*See* D.I. 110 at 24-25)  TL responds that the Distributorship Agreement prohibits only "active

solicitation" of sales outside of TL's territory, and that there is a genuine dispute of material fact

as to whether TL would have had to "actively solicit" CPEX customers in order to sell to them.

(D.I. 117 at 22-23 (internal quotation marks omitted))  In support of its argument, TL points to

evidence that parts purchasers prefer to buy from local dealers; hence, had there been no CPEX

accounts located in its territory, TL contends it would have made the sales that were made by the

CPEX accounts. (*See id.* at 22)

Taking the evidence in the light most favorable to TL, the record fails to raise a genuine

dispute of material fact.  At best, the evidence on which TL relies presents a factual dispute as to

whether TL would have been able to gain the business that otherwise went to CPEX accounts

without "actively soliciting" such business.  But, in context, this is not a material dispute.  The

record evidence is unrebutted that the only sales the CPEX accounts in TL's territory made were

to end users located outside of TL's territory.  (*See* D.I. 110 at 25)  The interrogatory responses

and witness testimony in this case uniformly reflect that the CPEX accounts located in Southern

Florida were set up "as a means by which to sell Terex parts to end users located in areas outside

of the U.S. where no Terex distributorship existed." (*Id.* at 14)  Although one Terex employee

noted that he is aware of "one or two" instances in which CPEX accounts sold parts to end users

in South Florida, the record identifies only one such occurrence – an incident in which TL ***itself***

placed the parts order on behalf of a client. (*See* D.I. 117 at 23; D.I. 120-7 at 3-5)  Because the

record contains no evidence that CPEX accounts sold Terex parts in TL's territory, other than at

TL's own request, the Court will grant summary judgment that TL may not recover lost profits for sales made by the CPEX accounts.

### 2.    Lost Profits Based on Terex's Sales to CPEX Accounts

TL contends that it is also entitled to lost profits based on sales Terex made to CPEX accounts located in TL's Southern Florida territory. TL argues that it, TL, otherwise would have made these sales to CPEX accounts, if Terex had not done so itself. Terex counters that this damages theory is untimely and, hence, Terex is entitled to summary judgment that TL cannot obtain damages based on such sales. The Court agrees with Terex.

TL's pleadings state that Terex harmed TL by inducing TL to enter into a contract in which it would have to compete with *CPEX accounts* to sell to customers located in its Southern Florida territory. (D.I. 20 ¶¶ 1, 11) TL's opening expert report on damages also reflects this (and solely this) theory of damages. TL now admits that it cannot point to any evidence of any sale by a CPEX to an end user in TL's territory of Southern Florida. (*See* Tr. at 22) TL's alternative damages theory – that TL was, in essence, forced to compete with *Terex itself* to sell to CPEX accounts located its Southern Florida territory – only emerged in TL's second expert report, *after* TL reviewed Terex's expert's report. (*See id.* at 28-29) (TL conceding that its alternative damages theory is not consistent with its earlier discovery requests and first emerged in its reply expert report)

Notably, TL's new damages theory could only be applicable, at best, to the period in which the parties' original Distributorship Agreement was in effect. This is because the 2011 modification of the Distributorship Agreement barred TL from selling products to CPEX accounts. Specifically, Section 3.6 of the 2011 Distributorship Agreement provides that TL may

not sell Terex parts to any party about whom TL has "reason to believe" intends to resell the products, "including any sub-distributor or reseller," unless TL receives prior written approval from Terex.[3] (D.I. 110 at 24) It is undisputed that CPEX accounts re-sold the Terex parts to end users. (*See id.* at 23; D.I. 117 at 21) There is no genuine dispute of material fact that the 2011 Distributorship Agreement prohibited TL from selling parts directly to CPEX accounts.; a reasonable jury could not find that TL lacked "reason to believe" CPEX accounts were resellers. As such, TL may not recover damages based on lost profits from Terex sales to CPEX accounts within TL's territory during the term of the 2011 Distributorship Agreement.

The question before the Court, then, is whether TL should be allowed to introduce its new, untimely damages theory for the period covered by the original Distributorship Agreement. The Court will not permit TL to do so.

A contrary decision would be highly and unfairly prejudicial to Terex. As Terex's counsel explained during oral argument, allowing such an amendment would require permitting Terex to take additional discovery, related, for instance, to calculation of damages arising from sales to re-sellers. Such discovery would include, at least, information about the nature and identity of CPEX accounts; the volume of parts sold to CPEX accounts; and the realistic capture ratio and mark-ups associated with sales to CPEX accounts. (*See* Tr. at 14-15)

TL's new theory of damages would categorically change the nature of TL's allegations, about which the parties have been litigating since the inception of this case. TL filed this lawsuit based on contentions that it had been forced to compete with CPEX dealers for sales to end users

---

[3]It is undisputed that this provision appears only in the 2011 Distributorship Agreement. (*See* D.I. 117 at 21)

in TL's Southern Florida territory.  Competition from Terex to supply parts to resellers is a

separate concern, apparently arising from facts TL learned in discovery.  Given that discovery is

closed, that TL only first asserted its materially changed damages theory in a reply expert report

served just three months before trial was scheduled to begin, and that trial is now less than one

month away, the Court will not permit TL to amend its complaint to add its new, untimely theory

of damages.

Accordingly, the Court will grant summary judgment that TL may not recover lost profits

damages arising from sales Terex dealers made to CPEX accounts.

**B.      Terex Motions - Other Grounds**

**1.      Parts Market Representations**

Terex argues that it is entitled to summary judgment with respect to all of TL's causes of

action which rely on the "Parts Market Representations" because TL admits that these

representations were truthful.  In its complaint, TL alleges that Terex falsely represented that

there was a "market for . . . parts . . . in Southern Florida."  (D.I. 20 ¶ 1)  Terex argues that this

representation was not false because there is no dispute that there was a market – indeed, a

"substantial" and "profitable" market – for parts in Southern Florida.  (*Id.* ¶¶ 6, 11)  TL responds,

essentially, that its allegation is not that Terex misrepresented the existence of *any* market for

parts, but rather that Terex misrepresented that there was a *market opportunity* for parts.  (*See*

D.I. 117 at 8)

The complaint supports TL's characterization of its allegations.  The complaint alleges

that "Terex represented that there was a market for Terex heavy equipment . . ."  (D.I. 20 ¶ 9)  It

further explains that Terex failed to disclose that TL was "surrounded by dealers in authorized

Terex parts," and states that TL would not have entered into the Distributorship Agreement with Terex if it had known about those dealers. (*Id.* ¶¶ 11-12)   Taken as true, and drawing reasonable inferences in favor of TL, the Court accepts that TL believed Terex to be representing that there was a market ***opportunity***.

Hence, the Court sees no basis to grant Terex's requested relief on the grounds that TL has failed to adequately allege (or adduce evidence sufficient to prove) that Terex's Part Market Representations were false.

### 2.    Statute of Limitations

Terex argues that the Delaware statute of limitations bars all of TL's causes of action based on the Dealership Selection Representations as well as the Dealer Representations and Omissions.  As the Court outlined in its previous Memorandum Opinion, Delaware's three-year statute of limitations applies, such that TL's claims are time-barred if they accrued more than three years prior to the filing of the complaint, i.e., before December 9, 2010. (*See* D.I. 62 at 6)

Terex argues that claims based on the Dealership Selection Representations are time-barred because TL admits that it was aware of the factual basis for those claims in 2009.  In support of this assertion, Terex cites testimony of TL's principal, Bryan Campbell, which includes statements to the effect that, "no later than 2009, [TL] became aware of Terex's alleged financial distress, 'revolving door' indiscriminate dealer policy, and strategy to sign up dealers in order to sell its equipment." (D.I. 110 at 20)

However, taking this evidence in the light most favorable to TL, as the nonmoving party, what TL knew was much more general (and less likely to trouble TL) than the information TL alleges (with the Dealership Selection Representations) that Terex failed to disclose: that Terex

11

"did not select distributors on the basis of demand in the marketplace or [the] quality of the distributor;" Terex "would give a distributorship agreement to any person who asked for it and had the financial ability to purchase whole goods;" and Terex "had . . . a practice of signing up distributors" and requiring them "to purchase whole goods without regard to the demand in [the] marketplace or the ability of the distributor to market the products." (D.I. 117 at 14 (internal quotation marks omitted); *see also* D.I. 20 ¶ 11) Thus, Terex has not met its burden to show that Delaware's statute of limitations bars those TL claims that are based on the Dealership Selection Representations.

Terex also argues that claims based on the Dealer Representations and Omissions are time-barred. This contention is based on TL's purported admission that it was aware of the factual basis for these claims in May 2010. In 2008, TL had noticed that Terex's website listed a number of authorized Terex dealers in Terex's territory. (*See* D.I. 20 ¶ 13) Terex told TL that the listings had been made in error, that the listed businesses "were not current dealers, [and] that the dealers would be shut down." (*Id.*) Later, in May 2010, a FedEx driver informed Mr. Campbell that there was another Terex dealer near TL. (*See id.* ¶ 14; D.I. 117 at 16) TL confronted Terex, sending Terex an email stating that the FedEx driver's statements confirmed the existence of other parts dealers. (*See* D.I. 20 ¶ 15; D.I. 117 at 16) In response, Terex continued to deny that such dealers existed. (*See* D.I. 20 ¶ 15) Terex argues that TL's email to Terex demonstrates that TL knew of other dealers in May 2010. TL responds that the email demonstrates only that TL was suspicious that there were other dealers and, given Terex's denials that such dealers existed, there is at least a genuine issue of material fact as to whether TL actually knew of other dealers by December 2010.

12

The Court again agrees with TL.  Taking the evidence in the light most favorable to TL, a reasonable jury could find that TL was unaware in 2010 that Terex had misrepresented or failed to disclose the facts that TL "was surrounded by dealers in authorized Terex parts who could sell those parts to customers without having to maintain the inventory of whole goods or infrastructure that Plaintiff was required to maintain," allowing the other dealers to undercut TL's prices. (*See* D.I. 62 at 3 (internal quotation marks omitted))  There are genuine disputes of material fact regarding when TL became aware of the existence of CPEX accounts; the nature of those accounts' relationship with Terex; and their ability to undercut TL's prices.  Thus, Terex has not met its burden to show that Delaware's statute of limitations bars those TL claims that are based on the Dealership Representations and Omissions.

### 3.    Issues Addressed in the Exclusivity and Merger Clauses of the Distributorship Agreements

Terex argues that it is entitled to summary judgment on all causes of action related to "Dealer Representations and Omissions" and as to all allegations that Terex fraudulently misrepresented to TL that it was the exclusive OEM parts dealer in its territory.  In Terex's view, these claims are barred as a matter of law because they are expressly contradicted in, or adequately covered by, the Distributorship Agreement between TL and Terex. (*See* D.I. 110 at 21)  TL responds that these provisions do not contradict or address the allegations of misrepresentations, and, even if they do, reliance is an issue of fact under Florida law that cannot be resolved at this stage. (*See* D.I. 42 at 6-14)

Terex argues that sections 2.1 and 10.1 of the Distributorship Agreement contradict or adequately address the representations on which TL bases its claims.  Section 2.1 states:

> Subject to the terms and conditions of this Agreement, Supplier hereby appoints Distributor as a non-exclusive distributor of Supplier's Products in the Territory described in **Schedule A** attached hereto (the "**Territory**") during the initial term of this Agreement described in **Schedule A** attached hereto (the "**Term**"). Distributor hereby accepts said non-exclusive appointment, and agrees to use its best efforts to maximize sales and leases of the Products in its Territory. Distributor hereby accepts responsibility for stocking, display, sale, lease, delivery, installation, follow-up and service of Products in the Territory. Distributor acknowledges and agrees that Supplier is free to sell, rent, lease or otherwise convey Products within the Territory, and to appoint other distributors for the Products within the Territory, without incurring any liability or obligation to the Distributor, whether for a commission or otherwise.

(D.I. 37 Ex. B at 2)

Section 10.1 is a merger clause and states:

> This Agreement, together with the standard Terms and Conditions, the Security Agreement and the schedules and attachments hereto and thereto, constitutes the entire agreement between Distributor and Supplier, superseding all prior oral or written agreements, policies or understandings, on the subject of the continuing relationship between Distributor and Supplier and, except as otherwise provided herein, may be amended only by a writing signed by both parties hereto. No failure of Supplier to insist upon strict compliance with any provision of this Agreement shall constitute waiver thereof for the future, and all provisions herein shall remain in full force and effect. The construction and interpretation of this Agreement will not be strictly construed against the drafter.

(*Id.* at 9)

Under Florida law, a party to a contract may not press fraud claims contradicted by or adequately addressed in a subsequent agreement. *See Altenel, Inc. v. Millenium Partners, L.L.C.*, 947 F. Supp. 2d 1357, 1369 (S.D. Fla. 2013). Some Florida courts have held that a claim may be barred where a contract contains a merger clause, *see Topp, Inc. v. Uniden Am. Corp.*, 513 F.

Supp. 2d 1345, 1348 (S.D. Fla. 2007), while others have disagreed and held that such a clause

does not bar a claim based on an oral representation which is alleged to have fraudulently

induced a party to enter into the contract, *see Mejia v. Jurich*, 781 So.2d 1175, 1178 (Fla. Dist.

Ct. App. 2001). In considering whether a merger clause bars a fraudulent inducement claim,

Florida courts perform a case-by-case analysis and look to see if the merger clause expressly and

specifically addresses the misrepresentations upon which the claims are based. *See Hobirn, Inc.*

*v. Aerotek, Inc.*, 787 F. Supp. 2d 1298, 1304 (S.D. Fla. 2011).

In its previous summary judgment opinion (D.I. 62), the Court found that Terex was not

entitled to judgment on the pleadings because Sections 2.1 and 10.1 of the Distributorship

Agreement neither contradict nor adequately address the Dealer Representations and Omissions.

The Court found that Section 2.1 spoke to Terex's ability to appoint other distributors in the

future (*see* D.I. 37 Ex. B at 2), but neither "address[ed] the existence of other distributors at the

time TL entered into the Distributorship Agreement, [n]or the terms of prior agreements between

Terex and other distributors." (D.I. 62 at 11) Thus, the Court concluded that the Distributorship

Agreement did "not bar a fraudulent inducement claim based on those alleged

misrepresentations and omissions." (*Id.*) Likewise, the Court found that Section 10.1 did "not

address any of the alleged misrepresentations at issue in the Dealer Representations and

Omissions." (*Id.*)

Terex now argues that "[d]iscovery has revealed that TL understood the non-exclusivity

provision" to refer to the possibility of dealers existing at the time TL and Terex entered into

their contract. (D.I. 110 at 22) Terex points out that, during his deposition, Mr. Campbell

testified that TL and Terex each understood that part of the purpose of the non-exclusivity

agreement was to account for the existence of another dealer operating in the same territory (GSE). (*See id.* at 12) TL responds that, even if this were true, these contractual provisions do not bar TL's fraudulent inducement claim because TL alleges that Terex misrepresented ***not*** that TL had a right to exclude, but instead that TL was the only parts dealer in its territory at the time the Distributorship Agreement was signed. (*See* D.I. 117 at 20) Because the Distributorship Agreement does not speak to the state of the parts market, TL argues, it does not adequately address Terex's representations to TL. (*See id.*)

The Dealer Representations and Omissions, as alleged in the complaint, are that Terex failed to tell TL that TL "was surrounded by dealers in authorized Terex parts who could sell those parts to customers without having to maintain the inventory of whole goods or infrastructure that Plaintiff was required to maintain. As a result of not having to maintain an inventory of whole goods, these dealers could undersell TL in the substantial and lucrative parts market." (D.I. 20 ¶ 11)

Given that it is undisputed that both TL and Terex understood that the Distributorship Agreement's exclusivity provision was meant to provide for the continued operation of pre-existing Terex parts distributors, the Court finds that the Distributorship Agreement adequately addresses the issue of whether Terex could permissibly supply parts to other, preexisting dealers. Although TL now argues that Terex affirmatively misrepresented whether it supplied parts to existing dealers, that is not part of what it alleged in its Dealer Representations and Omissions – TL instead alleged only that Terex had failed to inform TL of the existence of the existing dealers. (*See* D.I. 110 at 22-23; D.I. 117 at 20) The record, even taken in the light most favorable to TL, cannot support a reasonable jury finding for TL on the theory it has pled with

16

respect to the Dealer Representations and Omissions.

Accordingly, the Court will grant Terex summary judgment on TL's claims based on the Dealer Representations and Omissions.

### 4.    Damages Period

Terex has moved for summary judgment that TL is limited to recovering damages for the years 2009-2013, because TL's expert offered an opinion for only those years. (*See* D.I. 110 at 26) TL did not contest this portion of Terex's motion. (*See* D.I. 117) As such, Terex will be granted summary judgment that TL is limited to recovering damages arising from (at most) 2009-2013.

### C.    Motion for Judgment on the Pleadings

### 1.    Parts Market Representations

Terex argues that it is entitled to judgment on the pleadings with respect to all of TL's causes of actions based on the "Parts Market Representations" because TL admits that those representations were truthful. For the reasons discussed with respect to Terex's summary judgment motion on this same issue, Terex is not entitled to judgment on the pleadings on this basis. (*See* D.I. 110 at 15-16)

### 2.    Dealership Selection Representations

Terex argues that it is entitled to judgment on the pleadings with respect to all of TL's causes of actions which rely on the "Dealership Selection Representations." Terex argues that TL's allegations actually relate to omissions but fail because Terex had no duty to disclose the allegedly omitted information.

Under Florida law, neither party in an arms-length transaction "owes a duty to the other to

17

act for that party's benefit or protection, or to disclose facts that the other party could have discovered through its own diligence." *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1351 (S.D. Fla. 2005), *aff'd*, *Behrman v. Allstate Life Ins. Co.*, 178 F. App'x 862 (11th Cir. 2006). The Dealership Selection Representations include Terex's failure to disclose that it: "did not select distributors on the basis of demand in the marketplace or [the] quality of the distributor;" "would give a distributorship agreement to any person who asked for it and had the financial ability to purchase whole goods;" and "had . . . a practice of signing up distributors" and requiring them "to purchase whole goods without regard to the demand in [the] marketplace or the ability of the distributor to market the products." (D.I. 117 at 14 (internal quotation marks omitted); *see* D.I. 20 ¶ 11) In TL's view, Terex had a duty to disclose the information in order to ensure that its representation that there was a market for parts would not be misleading to TL. TL further states that it could not have obtained the information "even with diligent effort." (D.I. 117 at 9)

On this dispute the Court sides with Terex. Even if it were true that Terex signed up new dealers regardless of market demand in the dealer's area, it does not necessarily follow that there was no market demand in the Southern Florida territory in which Terex sought to sign up TL. Terex did not have a duty to disclose the information TL claims it had to disclose. The Court will grant Terex judgment on the pleadings with respect to TL's claims to the extent they rely on the Dealership Selection Representations.[4]

---

[4]The Court disagrees with TL's argument that its FDUTPA claim should survive even if the Court grants Terex judgment on the pleadings with respect to the common law fraud claims. (*See* D.I. 117 at 11-12) For the reasons already given in connection with fraud, Terex's alleged omissions are not "likely to mislead a consumer acting reasonably in" TL's circumstances. *See Millennium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen.*, 761 So. 2d 1256, 1264 (Fla.

### 3.    Dealership Representations and Omissions

Terex argues that it is entitled to judgment on the pleadings with respect to all of TL's

causes of action which rely on the "Dealership Representations and Omissions" because Terex

made no affirmative representations and had no duty to disclose the allegedly omitted

information.

The Dealer Representations and Omissions include Terex's failure to disclose that TL

"was surrounded by [CPEX accounts] who could sell [Terex] parts to customers without having

to maintain the inventory of whole goods or infrastructure that Plaintiff was required to

maintain," and consequently the dealers "could undersell TL in the substantial and lucrative parts

market." (D.I. 62 at 9 (internal quotation marks omitted))  In TL's view, this information tends

to undercut Terex's representation to TL – prior to entering into the first Distributorship

Agreement – that "it was necessary to become a full-line distributor in order to obtain parts."

(D.I. 117 at 10)  Further, TL argues that this information is inconsistent with Terex's

representations, prior to the 2011 agreement, that CPEX dealers were not authorized dealers in

Terex parts.  (*Id.*)  TL argues that it could not have learned, on its own, about the nature the

CPEX dealers' true relationships with Terex, and further notes that record evidence suggests that

Terex actively tried to misrepresent the nature of those relationships between 2008 and 2011.

TL has adequately alleged facts which could give rise to a duty on Terex's part to make

the representations TL alleges Terex should have made.  The Court will deny Terex's motion for

judgment on the pleadings to the extent TL's claims relate to the Dealership Representations and

---

Dist. Ct. App. 2000).  As such, the Court will grant Terex judgment on the pleadings on TL's
FDUTPA claim along with the common law fraud claims.

Omissions.

## IV.   CONCLUSION

For the reasons set forth below, Defendant's Motion for Both Summary Judgment and Judgment on the Pleadings will be granted in part and denied in part.